UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------x
NDB INC. (D/B/A BRONX AND BANCO),       :
       :
       Plaintiff,       :
       :
       -vs-       :
       :
CARLOS EROS A/K/A CARTER EROS,       :
  WEB DESIGNER 23, JOHN DOES 1-10,       :
       :
       Defendants.       :
--------------------------------------------------------------------x

## COMPLAINT

Wherefore, Plaintiff NDB Inc. d/b/a Bronx and Banco ("Plaintiff" or "Bronx and Banco"), by its attorneys, the law office of Weinberg Zareh Malkin Price LLP, as and for her Verified Complaint ("Complaint") against Defendant Carlos Eros A/K/A Carter Eros ("Mr. Eros"), Defendant Web Designer 23 ("WD23") and John Does 1-10 (collectively "Defendants"), hereby sets forth upon information and belief the following:

### PRELIMINARY STATEMENT

1. This is a case to address: breach of contract, breach of the implied covenant of good faith and fair dealing, and deceptive business practices under New York law; cybersquatting and trademark infringement pursuant to the Lanham Act, 15 U.S.C. § 1051 *et seq*.; and substantially related claims, in the alternative, of conversion, fraud, tort, unjust enrichment and breach of fiduciary duty under the common law of the State of New York.  The claims in this case all arise from Defendants' deceptive, bad faith acts and misdeeds, as well as the unauthorized use, and registration of a domain name incorporating, Plaintiff's world-renowned BRONX AND BANCO trademark.

2. This is a case of manipulation and dishonesty, and the theft of Plaintiff's lucrative

1

website(s) by its own contractor.

3.    Plaintiff is a successful international fashion label, selling high-end designer women's clothing throughout the world, for many years.

4.    Mr. Eros is an extortionist web designer masquerading as a legitimate IT professional based in the U.S.  Mr. Eros was hired by Plaintiff to assist with the acquisition, development and maintenance of its e-commerce website and company internet technology ("IT") systems.

5.    Defendants' services included registering the domain to be used for Plaintiff's website and maintaining the Plaintiff's IT accounts and systems.

6.    Unbeknownst to Plaintiff and contrary to Plaintiff's instructions, understanding and the Parties' contract terms, Defendants in bad faith registered web domains (including <bronxandbanco.com>) that incorporate Plaintiff's established global trademark and brand name, BRONX AND BANCO, in Defendant Eros's own name, rather than Plaintiff's.

7.    In other words, it is believed that ***Defendants trolled their own client, later outrageously attempting to lease back to Plaintiff that which should have been (and was always understood to be) the exclusive property of Plaintiff in the first place***.

8.    Eight years later, Plaintiff sought to replace the Defendants with a more professional and skilled provider.

9.    When the business relationship soured, Defendants held ***Plaintiff's business domains hostage, along with Plaintiff's operational IT systems, files, folders, and accounts*** for which Defendants had assumed administrative control.

10.  Defendants have sought to extort ludicrous amounts from Plaintiff, placing the domain up for public sale at an initial price of ***fifty million dollars ($50 million)*** and refusing

2

otherwise to release the sites and systems.

11.  As a result, Defendants effectively shut down Plaintiff's online sales through the website available from URL http://www.bronxandbanco.com, as Plaintiff could no longer use this website to sell its merchandise.

12.  As a result of Defendants' misconduct, Plaintiff could no longer access its IT systems, including emails and customer accounts.

13.  ***Defendants literally hold Plaintiff's business hostage***.

14.  Plaintiff accordingly seeks preliminary and permanent injunctive relief, including but not limited to an order from this Court enjoining Defendants from any further ownership and use of the domains, requiring that Defendants transfer the contested domains to the Plaintiff and release access to Plaintiff's IT systems.

15.  Plaintiff further seeks damages for the substantial loss of goodwill and customers proximately resulting from Defendants' knowing and malicious deception and malevolence.

16.  Finally, given the egregious and intentional malevolent conduct, Plaintiff seeks exemplary and punitive damages of at least one million dollars ($1 million) in addition to costs and attorneys' fees.

**PARTIES, JURISDICTION AND VENUE**

17.  Plaintiff **NDB Inc. D/B/A Bronx and Banco** is a New York corporation with a registered address of 166 Mercer Street, 2nd floor within the County of New York, State of New York.

18.  Plaintiff NDB Inc. d/b/a Bronx and Banco is wholly owned by its principal, **Natalie De'Banco**, an individual residing in the County of Suffolk, State of New York.

19.  Defendant **Carlos Eros A/K/A Carter Eros** is an individual residing in the State of Connecticut, who regularly conducts business within this Court's jurisdiction.

20. Upon information and belief, Mr. Eros is the owner and operator of **Web Designer 23**, a sole proprietorship conducting business within the City of New York, State of New York.

21. Upon information and belief, Mr. Eros has used a number of additional entities, **John Does 1-10,** in a shell game to try to hide his surreptitious misconduct.

22. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, which grants federal district courts original jurisdiction over all civil actions arising under the Constitution, laws, or treaties of the United States. Plaintiff's claims arise, in part, under the Lanham Act, 15 U.S.C. 1125(d), and therefore present a federal question within the meaning of 28 U.S.C. § 1331.  This Court also has jurisdiction over this matter pursuant to 28 U.S.C. § 1331(a)-(b), which grant federal district courts original jurisdiction over all civil actions arising under the Lanham Trademark Act, as well as any claims of unfair competition when joined with substantial and related claims under the Lanham Act.

23. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a) because those claims are so related to the federal claims over which this Court has original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

24. Specifically, Plaintiff's state law claims arise from the same nucleus of operative facts as the federal claims and share common questions of law and fact.

25. Personal jurisdiction in this District is proper because, upon information and belief, Defendants do business in New York.

26. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because: (1) a substantial part of the events or omissions giving rise to the claims occurred in this District; and (2) a substantial part of property that is the subject of the action is situated in this District.

**FACTUAL ALLEGATIONS**

27.    At all relevant times, Ms. De'Banco, or Plaintiff as her successor in interest, has been the owner of all the intellectual property at issue herein, including in the years *prior* to hiring the Defendant.

28.    Ms. De'Banco launched the Bronx and Branco fashion brand in Australia in 2009, under the inherently distinctive trademark BRONX AND BANCO.

29.    It quickly grew, garnering global attention and a devoted following throughout the world.  Sales were made in U.S. commerce under the BRONX AND BANCO name and mark.

30.    About eight years ago, in 2018, and with the global rights to BRONX AND BANCO already established in multiple countries throughout the world, Ms. De'Banco physically relocated from Australia to New York to further expand the business.

31.    Since then, luxury fashion items including clothing, jewelry, handbags and accessories, have been sold under the BRONX AND BANCO mark, both online and in high-end retail department stores.  Luxury goods bearing the prestigious BRONX AND BANCO label have been worn by cultural icons and appeared in cutting edge fashion magazines.

32.    Under the BRONX AND BANCO mark, the brand has become synonymous with cosmopolitan glamour, standout silhouettes, and an unapologetically feminine point of view.

33.    The brand has garnered an image and recognition among its U.S. clients, some of whom are household names themselves.  The brand has been featured in well-known and highly-regarded fashion magazines, including *Bazaar*, *Vogue Weddings*, and others.

34.    As a luxury fashion brand, Bronx and Banco is unquestionably successful.

**The origin of "bronxandbanco.com."**

35.    Prior to relocating to the United States, Bronx and Banco (named to reflect Ms. De'Banco's surname) sold its merchandise online through its Australian-based website:

36.    The domain for this Australian-based website was registered to Ms. De'Banco.

37.    After relocating to the United States, on or about March 2018, Ms. De'Banco sought to elevate the company's profile by establishing a U.S.-based website (a ".com" site), which she would use for sales in the United States primarily, as well as abroad.

38.    To that end, she sought an IT developer, who could assist her with launching a new U.S.-based website to be located at "www.bronxandbanco.com."

39.    According to its website, htttps://webdesigner23.com, W23 is a web design and development company, assisting with the buildout of e-commerce websites and located in New York City.

40.    Ms. De'Banco approached Mr. Eros, owner and operator of WD23, who made representations that his entity could develop, run, host and administer her intended U.S.-based e-commerce website and Bronx and Banco's IT systems.

41.    Plaintiff reasonably relied upon these representations.

42.    At that time, <bronxandbanco.com> was available for purchase for a nominal fee as Bronx and Banco was still in its infancy in the United States, and the name otherwise carried no monetary value or recognition. [1]

43.    During their conversations, the Parties reached an agreement whereby the Defendants would first register the domain for the website under Bronx and Banco's ownership and then build-out and assist with IT-related marketing strategies.

44.    Plaintiff contracted for Defendants to obtain the domain name for Plaintiff.

45.    To be clear, at no point did the Parties agree, nor did Defendants even mention, that

---

[1] The name "Bronx and Banco" derives from a combination of Ms. De'Banco's surname and nickname.

the <bronxandbanco.com> domain would be owned by anyone other than Plaintiff.

46.    This is especially true given the relatively minimal cost of obtaining the domain name at that time.

47.    Nor was there any reason for Ms. De'Banco otherwise to believe that the website associated with her company's name would not belong to her company.

48.    To the contrary, knowing that her business relied substantially on the online sales of her label, Ms. De'Banco only agreed (and would only have agreed) to the website being secured under her company's ownership.

49.    Anything to the contrary would have been outrageous. But that is precisely what Defendants did: buying the Plaintiff's IP out from under her when they should have been securing it for Plaintiff.

50.    To be clear, Plaintiff hired Defendants to purchase the domain name <bronxandbanco.com> (for Plaintiff's preceding brand) for Plaintiff.

51.    WD23's online advertising and marketing reinforces this understanding.

52.    WD23 describes itself as: "a fully in-house digital agency focusing on branding, marketing, web design and development with clients ranging from start-ups to large companies."[2] *Available at* *https://webdesigner23.com*.

53.    Defendants were instructed to obtain the domain name <bronxandbanco.com> for Plaintiff and were hired specifically to do so.

54.    In return, Plaintiff paid regular fees to Defendants pursuant to the Parties' agreement.

55.    Relying on the foregoing representations, agreements, understandings and impressions, Ms. De'Banco agreed to hire Mr. Eros, and his sole proprietorship, to assist with the

---

[2] Bronx and Banco is included on WD23's website as a client. *Available at https: https://webdesigner23.com/encounters.*

registration and subsequent design, development and management, of her Company's website and IT systems.

56.    Again, the Parties understood and agreed that the domain <bronxandbanco.com> along with the existing domain <bronxandbanco.com.au> (collectively "Domain Names") *used by Bronx and Banco would be registered for the sole benefit of Bronx and Banco*, who would retain all ownership rights.

57.    Accordingly, on or around March 2018, Defendants were contracted to register <bronxandbanco.com> *in the name of Plaintiff.*

58.    Or so Ms. De'Banco was led to believe.

59.    Shortly before then, Ms. De'Banco had instructed the filing of an application with the U.S. Patent and Trademark Office ("USPTO") to register the BRONX AND BANCO trademark (the "Trademark").  Application Ser. No. 87/836,206 ("the '206 Application") was filed on March 15, 2018, covering certain women's apparel items and reflecting that the mark had been used on these goods in U.S. commerce at least as early as December 1, 2017.

60.    Incontestable Reg. No. 5640961 for BRONX AND BANCO ("the '961 Reg.") issued on January 1, 2019, and remains valid and enforceable to this date.[3] A true and correct copy of the trademark registration status is attached hereto as part of composite **Exhibit 1**.

61.    Plaintiff is also the owner of U.S. Reg. Nos. 8148815 ("the '815 Reg.") and 8148788 ("the '788 Reg."), each identifying the same BRONX AND BANCO trademark for use on retail services in International Class 35 and jewelry items in International Class 14, respectively.  The '815 Reg. issued on February 24, 2026 and indicates a date of first use in U.S. commerce at least

---

[3] The '206 Application was originally filed in the name of a company owned by Ms. De'Banco's former husband and then later assigned to Bronx and Banco in January 2025.  Nonetheless, the original trademark filing was made at Plaintiff's instruction, and Plaintiff has been the exclusive user of the BRONX AND BANCO trademark in the U.S. and worldwide, at all times relevant.

as early as 2011.  The '788 Reg. issued on February 24, 2026 and indicates a date of first use in U.S. commerce of at least as early as September 2020. Both registrations remain valid and enforceable today.

62.    In addition to its three U.S. trademark registrations for BRONX AND BANCO as identified above, Plaintiff owns two pending federal trademark applications on that same mark. App. Ser. No. 99162932 ("the '932 App.") identifies certain handbags and related items in International Class 18, while App. Ser. No. 99162948 ("the '948 App.") identifies an expanded class of women's apparel items in International Class 25.  Both pending applications were filed on April 30, 2025, have published for opposition and were subsequently "allowed" by the USPTO in March 2026. The '948 App. in part claims use in commerce of the BRONX AND BANCO mark that occurred at least as early as January of 2009.

63.    The Trademark, as reflected in the '961, '815 and '788 Registrations as well as the '932 App., the '948 App. and Plaintiff's common law rights, has been remarkably successful and is recognized throughout the United States as well as globally as a distinctive trademark synonymous with cutting-edge style, vibrant hues, and slick tailoring.

64.    WD23 has continuously invoiced Bronx and Banco for its design and development services, charging approximately $7,000-$10,500 monthly.

65.    Neither Ms. De'Banco nor any of her employees at Plaintiff are IT professionals or domain name experts.  Understandably, then, Plaintiff relied on Defendants to act in good faith in providing needed IT services and expertise.  Defendants encouraged Plaintiffs to so rely.  And, indeed, reasonably relying on Defendants' ongoing representations that they were acting in Plaintiff's best interests and following Plaintiff's instructions, Plaintiff has paid tens of thousands of dollars to Defendants annually to maintain its IT services and its websites (both US and

9

Australian).

66.    Significantly, Plaintiff never paid Defendants to *lease* the Domain Names that Plaintiff ought to have owned outright, but which Defendants stole.

67.    None of those invoices included itemized charges for the use of the <bronxandbanco.com> domain or otherwise indicated that Plaintiff was not the registered owner. In other words, Defendants used intentionally misleading silence to lull Plaintiff into believing all was well and that Plaintiff's instructions were being followed.

68.     Significantly, the invoices generally refer solely to services described as: "monthly webmaster, hosting, maintenance & updates." *See, e.g.,* Invoice dated February 2, 2026, a true and correct copy attached hereto as **Exhibit 2.**

69.    In short, Defendants led Plaintiff to believe that they were providing only IT support, not also leasing the Domain Names reflecting Plaintiff's brand.

70.    More broadly, throughout their eight-year business relationship and despite numerous conversations, Defendants referred to the Domain Names as that of Plaintiff's.

71.    Mr. Eros never mentioned, nor otherwise communicated to Ms. De'Banco that the domains upon which she was relying entirely for her business were not registered to her or her company.

72.    Ms. De'Banco had no reason otherwise to believe that the Domain Names were owned by her contractor – until she decided to leave the Defendants.

73.    To be clear, the Parties had an agreement that Defendants would purchase and maintain the Domain Name(s) *for the Plaintiff*.  Defendant broke this promise.

74.    At that point, when Plaintiff chose to go with another provider, Defendant shut down Plaintiff's Domain Names / websites and her business operating through those websites –

entirely.

75. Defendant's conduct is an intentional and malicious money grab, contrary to the law.

**Defendants' Deception and Retaliation**

76. On or about January 3, 2026, Ms. De'Banco informed Mr. Eros that she wished to terminate their business relationship and transition to a new service provider.

77. Mr. Eros became incensed, determined to seek retribution against Plaintiff.

78. Not only did he refuse to cooperate in the transition, but he embarked on a vicious campaign to sabotage Ms. De'Banco's business by holding her websites and IT systems hostage.

79. After terminating the Defendants' services, Defendants sabotaged the Plaintiff's IT.

80. As a direct result of the Defendants' misconduct, Ms. De'Banco was prevented from accessing *the entirety of the Bronx and Banco's internal IT systems* (including but not limited to: Shopify, Microsoft Office, Microsoft 365, email, social media, QuickBooks) all of which had been hosted by Defendants as well as the domains <bronxandbanco.com> and <bronxandbanco.com.au>.

81. Defendants effectively sent Ms. De'Banco's and her trendy clothing company back to the 1970's.

82. As a result, Plaintiff not only lost access to the IT systems, files, folders and accounts necessary to sustain its business operations, but also numerous customers, who instead of visiting the expected online store, were and continue to be greeted with a message that the Domain Names are for sale:



83.   Despicably, rather than transition to Plaintiff's subsequent contractor, Defendants decided to seek revenge and sabotage Plaintiff's Trademark, reputation and intellectual property.

84.   With each passing hour, Plaintiff continues to lose revenues as a direct result of Defendants' tortious conduct.

85.   Initially, on or about March 5, 2026, Defendants listed the <bronxandbanco.com> domain available for purchase for *fifty million dollars ($50,000,000) minimum offer*. A true and correct copy of the sale listing is attached hereto as **Exhibit 3**.

86.   Also listed for sale at fifty thousand dollars was <bronxandbanco.com.au>.

87.   The Domain Names remain for sale.

88.   It is believed that the Mr. Eros seeks to collect the $50 million ransom through a number of shell entities or straw men.

89.   No outside Parties would have been aware of the dispute between Mr. Eros and Ms. De'Banco.

90.   Moreover, the timing of the loss of access and subsequent sale of the Domain Names coincides with the termination of the Defendants' services.

91. Hence, it is believed that the Defendants control the Domain Names and are attempting to extract payment from Ms. De'Banco as a condition of releasing them back to her.[4]

**Subsequent events.**

92. Constrained in the ability to run its business effectively and losing substantial earnings daily, if not hourly (in addition to customer goodwill, which may never be recovered), Plaintiff through counsel, sent a formal demand letter to Mr. Eros on February 27, 2026, demanding that he transfer the administrative accesses to the company's business accounts and release the Domains. A true and correct copy attached hereto as **Exhibit 4**.

93. The demand letter made clear that Bronx and Banco had engaged his company, WD23, to provide web development services, including registration and management of the Domain Names on the behalf of Bronx and Banco, and that it was "understood and agreed" that the Domain Names would be registered for the sole benefit of the company, who would retain all ownership rights.

94. Mr. Eros responded, on behalf of WD23, on March 2, 2026, asserting that the company no longer had access to, custody of, or administrative control over the Bronx and Banco business accounts.

95. This simply does not make sense in a professional setting, after eight years of running the Company's IT.

96. Mr. Eros further claimed – for the first time - the Domain Names to be an "aftermarket domain asset" maintained under a month-to-month lease structure, never owned by Bronx and Banco.

97. According to Mr. Eros, no ownership rights were ever "conveyed absent a separately

---

[4] Plaintiff has attempted to identify the registrants of the Domain Names, but the identity is currently "cloaked" through a proxy service and therefore cannot be confirmed without a Court Order to the Registrar.

executed purchase agreement."

98. Plaintiff, through counsel, responded the same day, reiterating the need to return and restore account/system accesses and the Domains Names to Plaintiff.

99. Mr. Eros refused to do so and instead again *refused to turn over control over the business accounts* and reiterated that the Domain Names were being held through an independent domain broker on a pay-as-you-go lease basis.

100. Despite repeated further requests by counsel for Plaintiff, Mr. Eros has continued to refuse to cooperate or follow the law.

101. He has been given notice of the economic and reputational damage he is inflicting, including but not limited to, online sales and customer traffic.

102. His only response has been greed: demanding money to turn over what rightfully belongs to Plaintiff.

103. The Domain Names remain available for sale at an exorbitant price by (indirectly) Defendants, it is believed.

104. Bronx and Banco continues without operational access to its IT systems, files, folders and accounts.

105. In the meantime, Plaintiff suffers damages on a daily basis, with internet traffic going to websites offering the Domain Names for sale, and losing out on revenues.

106. The Plaintiff's damages will be determined at trial but are believed to be at least $500,000 annually.

107. Plaintiff has attempted to mitigate damages by hiring another company and utilizing another similar domain name, but the damages and lost revenues continue to mount daily as a direct result of Defendants' misconduct.

14

## CLAIMS FOR RELIEF

### COUNT I
### (Breach of Contract – As Against Eros and WD23)

108.  Plaintiff repeats the allegations set forth in the above paragraphs as if set forth herein.

109.  On or about March 2019, Plaintiff and Defendants Mr. Eros and WD23 agreed that they would provide design and development services for Plaintiff's anticipated e-commerce website.

110.  As part of that contract, Defendants agreed to acquire a domain to be used for Plaintiff's e-commerce business.

111.  It was agreed and understood that Defendants would register the domain in Plaintiff's name, and Plaintiff would hold exclusive rights to the ownership and use of the domain.

112.  The Parties further agreed that Defendants would provide web-hosting services, including maintenance and updates and that Defendants would manage and maintain the Plaintiff's IT systems and accounts

113.  The services agreement offered by Defendants and accepted by Plaintiff was payable on a month-to-month basis and terminable at will.

114.  Defendants invoiced Plaintiff monthly, and Plaintiff paid Defendants the amounts invoiced.

115.  To be clear, Defendants' own writings – month after month – stated only "Webmaster, hosting, maintenance and updates" services, as agreed upon by the Parties.

116.  As reflected in WD23's monthly invoices, Defendants were never contracted to register the client's Domain Names in the IT Defendant's own name, nor that of a shell entity.

15

117. Moreover, the monthly invoices forwarded by Defendants do not include lease payments for the use of the <bronxandbronco.com> domain or <bronxandbanco.com.au> or otherwise suggest that the Parties' had agreed to such payments.

118. Defendants, therefore, breached the terms of its contract with Plaintiff by purchasing the domain <bronxandbronco.com> in their own name(s) and transferring ownership of the domain <bronxandbanco.com.au>.

119. Defendants further breached the terms of the Parties' contract by failing to properly host and maintain Plaintiff's IT operational systems, files, folders and accounts.

120. Specifically, by purchasing the Domain Name(s) for any entity other than Plaintiff, and also by removing Plaintiff's access to and use of these systems, Defendants breached the Parties' agreement.

121. Plaintiff accordingly seeks damages proximately resulting from Defendants' breach of the Parties' contract in an amount to be determined at trial.

## COUNT II
### (Breach of Implied Covenant of Good Faith and Fair Dealing – As Against Eros and WD23)

122. Plaintiff repeats the allegations set forth in the above paragraphs as if set forth herein.

123. A covenant of good faith is implied in all contracts, whether written or oral.

124. In return for fees charged, the Parties agreed that Defendants would register the domain <bronxandbanco.com> to Plaintiff for Plaintiff's exclusive use and control.

125. There was no logical reason for Plaintiff to allow the Domain Names, used exclusively for Plaintiff's business, to be owned by any entity other than itself.

126. Defendants, by concealing their intent to register the Domain Names in a name other than the Plaintiff's, intentionally sought in bad faith to deceive Plaintiff.

16

127. Defendants' conduct undermined Plaintiff's ability to benefit from the Parties' contract, namely ownership of the Domain Names in perpetuity.

128. As a result of Defendants' bad faith behavior, Plaintiff has been damaged economically by among other things, the loss of customer traffic, online sales and good will.

129. Plaintiff accordingly seeks an award of damages, representing lost profits and goodwill, in an amount to be determined at trial, attorneys' fees and costs, injunctive relief and such other damages as may be available at law and equity.

**COUNT III**
**(In the alternative, Deceptive Business Practices Pursuant to New York General Business Law § 349 – As Against All Defendants)**

130. Plaintiff repeats the allegations set forth in the above paragraphs as if set forth herein.

131. Defendants' acts alleged herein, including the design and development of customer websites, is directed to consumers, such as Plaintiff.

132. Defendants, working in tandem and aiding and abetting one another, are believed to have used deception and malice to entice Plaintiff and other New Yorkers into hiring them to obtain domain name(s) but then surreptitiously acquiring the intellectual property in the name of others, and seeking extortionary fees.

133. It is believed that discovery will show Defendants have engaged in a concerted campaign to entice innocent members of the public to hire them for IT contracting and thereafter sought to extort the victims' own intellectual property.

134. Specifically, Defendants advertise that they provide "powerful web services to run your personal or business website."

135. In fact, it is believed the Defendants then – surreptitiously, and likely through the use of shell entities and straw men – indirectly or directly own /control victims' websites and

17

information technologies

136. In short, Defendants prey off of innocent businesses, deceiving New Yorkers out of legitimate revenues, while seeking to blackmail them for millions of dollars for intellectual property already owned by the victims (or believed by them to be owned), but for the Defendants' misconduct.

137. For example, here, by their acts and omissions, Defendants willfully misled Plaintiff into believing that the domain Defendants acquired on Plaintiff's behalf, <bronxandbanco.com,> would be owned by Plaintiff.

138. By their acts and omissions, Defendants also willfully misled Plaintiff into believing that she would continue to own the domain previously registered under her name, <bronxandbanco.com.au.>

139. The ownership of these Domain Names was material to Plaintiff's business operations.

140. No reasonable consumer, and certainly not the Plaintiff, would have agreed to Defendants' services had Defendants' true intent been known.

141. Reasonable consumers hiring Defendants to assist with the development of an e-commerce website, were wrongly led to believe the domains used for online sales would be under those businesses' ownership.

142. Defendants alone possessed material information, namely that domains they acquire (or run) for clients would be owned exclusively by Defendants. Defendants failed to provide that information to the Plaintiff, as a reasonable consumer relying upon the description of services provided on Defendants' website.

143. Plaintiff – like other New York consumers – was misled to believe that the essence

18

of her contract with Defendants was to establish, design and maintain the website for Plaintiff's

exclusive use and control until such time as Plaintiff alone decided to relinquish her ownership.

144. As a result, Plaintiff has been economically damaged and is entitled to recover actual

damages in an amount to be determined at trial and attorneys' fees.

**COUNT IV**
**(Violation of Anticybersquatting Consumer Protection Act (15 USC § 1125(d) –**
**As Against All Defendants)**

145. Plaintiff repeats the allegations set forth in the above paragraphs as if set forth herein.

146. BRONX AND BANCO is a legally protected Trademark registered with the USPTO

by Plaintiff, as reflected by U.S. Reg. Nos.  5640961, 8148815 and 8148788 and U.S. App. Ser.

Nos. 99162932 and 99162948.

147. BRONX AND BANCO is accordingly a "distinctive" mark with unique recognition

in the minds of its consumers for cutting-edge style, vibrant hues, and slick tailoring. Plaintiff's

priority in and rights to the BRONX AND BANCO mark in the U.S. predate any involvement

with Plaintiff's business, mark or domain name by any of the Defendants.

148. Plaintiff is a commercially successful business entity with substantial goodwill

associated with the Trademark.

149. It was and is Defendants' bad faith intent to profit from the Trademark by stealing

domains comprised of the Trademark away from under Plaintiff and then extorting millions of

dollars to allegedly buy it back.

150. Defendants, working in tandem and aiding and abetting one another, have

accordingly registered in bad faith and used the domain name <bronxandbanco.com>, which is

identical to and/or confusingly similar to the BRONX AND BANCO mark, a Trademark

distinctive on or about the time of the domain registration.

19

151. The Domain Names include the surname of Ms. De'Banco, owner and founder of Bronx and Banco.

152. The Defendants have placed the domain <bronxandbanco.com> up for sale in the public *marketplace, outrageously, for fifty million dollars ($50 million).*

153. The Defendants' offer to transfer, sell, or otherwise assign the domain name for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services is in violation of the Lanham Act.

154. The Defendants have further intentionally refused to provide accurate information regarding the contact information of the registrar of the Domain Names and/or to deny their registration of the Domain Names.

155. As a proximate result of Defendants' violations of the Lanham Act, Plaintiff is entitled under 15 USC § 1117 to: (a) the transfer of the Domain Names to Plaintiff as the lawful owner of the BRONX AND BANCO mark; (b) damages sustained, including but not limited to, the loss of profits and goodwill in an amount to be determined at trial; and (c) the costs of this Action.

156. It is believed that as a proximate cause of Defendants' misconduct Plaintiff has lost access to almost all of its original revenues and has suffered damages in an amount to be determined at trial but in no event less than $500,000.

157. This is an exceptional case and Plaintiff is therefore also entitled to recover reasonable attorneys' fees pursuant to 15 U.S.C.§1117.

**COUNT V**
**(Trademark Infringement in violation of 15 U.S.C. §1114, et seq. (Lanham Act) –**
**As Against All Defendants)**

158. Plaintiff repeats the allegations set forth in the above paragraphs as if set forth

herein.

159. Plaintiff is the owner of valid and subsisting United States Trademark Registration Nos. 5640961, 8148815 and 8148788 for the BRONX AND BANCO mark.  The '961 Reg. issued  on January 1, 2019 and the '815 and '788 Registrations issued on February 24, 2026. *See* Exhibit 2.

160. The '961 Reg. is incontestable pursuant to 15 U.S.C. § 1065, having been in continuous use in commerce for more than five consecutive years following registration. Plaintiff has filed the required affidavits of continued use and incontestability with the USPTO.

161. Plaintiff has used the Trademark continuously in interstate commerce in connection with the sale of clothing and related luxury fashion items in the United States, since at least as early as 2009, and has expended substantial resources in advertising, promoting, and building goodwill in the Trademark. As a result, the Trademark has become widely recognized by consumers as identifying Plaintiff as the source of goods and services offered under the Trademark.

162. Without Plaintiff's authorization, license, or consent, Defendants, working in tandem and aiding and abetting one another, have used in commerce a mark that is identical or confusingly similar to Plaintiff's Trademark, namely <bronxandbanco.com> and <bronxandbanco.com.au.>  Defendants' use of the infringing mark is likely to cause confusion, mistake, or deception among consumers, and as to Defendants' connection or association with Plaintiff.

163. The likelihood of confusion between Plaintiff's Trademark and Defendants' infringing marks is demonstrated by the following factors: (a) the marks are identical or highly similar in appearance, sound, and commercial impression; (b) Plaintiff's Trademark is strong and

distinctive; and (c) Defendant adopted and used the infringing mark with knowledge of Plaintiff's prior rights in and to the Trademark.

164. Defendants' acts of infringement have been willful, intentional, and in deliberate disregard of Plaintiff's rights, entitling Plaintiff to enhanced damages and an award of Defendants' profits, damages sustained by Plaintiff, and the costs of this Action, pursuant to 15 U.S.C. § 1117(a).

165. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered and continues to suffer irreparable harm to its goodwill and reputation, for which there is no adequate remedy at law, as well as monetary damages in an amount to be proven at trial.

166. This is an exceptional case and Plaintiff is therefore also entitled to recover reasonable attorneys' fees pursuant to 15 U.S.C. § 1117,

**COUNT VI**
**(In the alternative, Conversion – As Against All Defendants)**

167. Plaintiff repeats the allegations set forth in the above paragraphs as if set forth herein.

168. As alleged herein, Plaintiff had a greater right to the possession of the Domain Names <bronxandbanco.com> and <bronxandbanco.com.au> and to Plaintiff's IT business systems, files, folders, and accounts.

169. As the owner and user of the BRONX AND BANCO trademark, Plaintiff has property rights in the Domain Names <bronxandbanco.com> and <bronxandbanco.com.au>.

170. Defendants, however, assumed control over the Domain Names and the Plaintiff's IT systems, files, folders and accounts.

171. Despite Plaintiff's demand for their return, Defendants, working in tandem and aiding and abetting one another, have refused to transfer ownership and administrative rights.

22

172. By assuming control over this property, Defendants interfered with the Plaintiff's property in a manner that infringed on the Plaintiff's rights and converted the property for their own use and benefit.

173. As a proximate result of Defendants' conversion of Plaintiff's property, Plaintiff is entitled to: (a) the return of the property, including the Domain Names and all administrative access necessary to assume operational control of Plaintiff's IT systems, files, folders and accounts; and (b) an award of damages representing, among other things, lost profits and goodwill in an amount to be determined at trial in addition to injunctive relief.

**COUNT VII**
**(In the alternative, Tort: Fraud in the inducement –**
**As Against Defendants Eros and WD23)**

174. Plaintiff repeats the allegations set forth in the above paragraphs as if set forth herein.

175. As alleged herein, Plaintiff would not have agreed to the services of Defendants had Plaintiff known that Defendants would be the owner of the Domain Names upon which Plaintiff relied for the operation of its e-commerce business.

176. Defendants knew that Plaintiff was intending that Defendants purchase the domain <.bronxandbanco.com> on Plaintiff's behalf and under its ownership.

177. Defendants knew that Plaintiff's business relied substantially on the use of the domain for the sales of its merchandise.

178. Defendants, however, had no intention of living up to their promises, and in fact, knew that they would be registering the domain under his own name.

179. By omitting this material fact, Defendants induced Plaintiff to agree to the use of his services that Plaintiff would not otherwise have agreed to.

180. Plaintiff justifiably relied upon the Defendants' misrepresentations when entering

23

into the transaction and has been damaged as a direct result of these misrepresentations.

181. Because Defendants knew from the outset that they would never provide what Plaintiff believed to have been promised, they fraudulently induced Plaintiff to agree to their services and should be estopped from enjoying the benefits of their wrongdoing.

182. As a proximate result of Defendants' willful and wanton fraudulent inducement, Plaintiff has suffered economic damages and is entitled to an award against Defendants in an amount to be determined at trial, reasonable attorneys' fees and costs, injunctive relief and such other damages as may be available at law and equity.

183. Moreover, Defendants' efforts to damage Plaintiff's business in such a manner evinces a high degree of moral turpitude that demonstrates such wanton dishonesty as to imply a criminal indifference to civil obligations.

184. In light of Defendant's intentional and egregious behavior, therefore, to extort Plaintiff for millions of dollars by holding its website hostage, Defendants should be required to pay punitive damages in an amount no less than one million dollars ($1,000,000) or such other amount as this Court deems just and appropriate.

## COUNT VIII
### (In the Alternative, Unjust Enrichment – As Against All Defendants)

185. Plaintiff repeats the allegations set forth in the above paragraphs as if set forth herein.

186. Upon information and belief, Defendants, working in tandem and aiding and abetting one another, are receiving the benefit of the use and enjoyment of the Domain Names containing Plaintiff's Trademark without just compensation.

187. It is against equity and good conscience, to permit Defendants to retain the Domain Names and the attendant benefits of that ownership when the Defendants have willfully acted in violation of the conditions for which the domains were originally acquired.

188. Equity and good conscience require Defendants to transfer the Domain Names to Plaintiff and to compensate Plaintiff for the willful and wanton harm inflicted by Defendants upon Plaintiff's business.

189. Moreover, Defendants' efforts to damage Plaintiff's business in such a manner evinces a high degree of moral turpitude that demonstrates such wanton dishonesty as to imply a criminal indifference to his civil obligations.

190. In light of Defendants' willful and wanton efforts to hold the Domain Names hostage in retaliation for Plaintiff's termination of Defendants' services, Defendants should be required to pay punitive damages in the amount of no less than one million dollars ($1,000,000) or such other amount as is sufficient to deter Defendants from such future bad behavior.

191. Thus by reason of the Defendants' unjust enrichment, Plaintiff is entitled to an award of compensatory damages, attorneys fees and costs, and such further restitution, compensation and punitive damages in the amount of no less than one million dollars ($1,000,000) or such other amount as this Court deems just and appropriate.

### COUNT IX
### (In the Alternative, Tort: Fraudulent Misrepresentation – As Against All Defendants)

192. Plaintiff repeats the allegations set forth in the above paragraphs as if set forth herein.

193. Upon information and belief, Defendants, working in tandem and aiding and abetting one another, fraudulently misrepresented the intent to purchase and register the domain <bronxandbanco.com> in their own name.

194. Upon information and belief, Defendant knew or should have known that Plaintiff was reasonably relying on their representations to register that domain under its name, and Plaintiff did in fact rely upon these representations when accepting the Defendants' services.

195. Plaintiff would not have accepted and paid for the Defendants' services had it known that Defendants would be retaining ownership of the domain <bronxandbanco.com>.

196. In the same way, Plaintiff would not have accepted and paid for the Defendants' services had it known that Defendants would transfer ownership of the domain <bronxandbanco.com.au> into Defendants' name.

197. Plaintiff was thus materially damaged by Defendants' fraudulent misrepresentations, by among other things, losing use of the websites needed for the continued operations of the Plaintiff's business.

198. Moreover, Defendants misrepresented at the time of hiring that Plaintiff would lose administrative access to all its business IT systems, files, folders and accounts, upon termination of Defendants' services.

199. Plaintiff would not have accepted and paid for the Defendants' services had it known that doing so would constrain Plaintiff to paying monthly service fees indefinitely – or risk losing operational control of its business systems.

200. Plaintiff was thus materially damaged by Defendants' fraudulent misrepresentations, by among other things, losing use of its IT systems, files, folders and accounts needed for the continued operations of the Plaintiff's business.

201. Defendants' efforts to damage Plaintiff's business in such a manner evinces a high degree of moral turpitude that demonstrates such wanton dishonesty as to imply a criminal indifference to civil obligations.

202. In light of Defendants' intentional egregious behavior to further extort Plaintiff for millions of dollars by holding its websites hostage and refusing to turn over needed administrative accesses, Defendants should be required to pay punitive damages in an amount no

less than one million dollars ($1,000,000).

203.  As a proximate result of Defendants' fraudulent misrepresentation, Plaintiff is entitled to an award of damages representing, among other things, lost profits and goodwill in an amount to be determined at trial, reasonable attorney fees and such other compensatory and punitive damages in the amount no less than one million dollars ($1,000,000) or such other amount as this Court deems just and appropriate.

**COUNT X**
**(Breach of fiduciary duty – As Against Eros and WD23)**

204.  Plaintiff repeats the allegations set forth in the above paragraphs as if set forth herein.

205.  By virtue of Plaintiff's business relationship with Defendants, Plaintiff reposed trust and confidence in Defendants to provide services and to refrain from acting in any manner contrary to Plaintiff's interests.

206.  Plaintiff undertook such trust and confidence in Defendants to safely and securely maintain and host its IT systems and Domain Names.

207.  By reason of the foregoing, Defendants owed Plaintiff a fiduciary duty and duty of loyalty to act in good faith and in Plaintiff's best interest throughout their engagement with Plaintiff and through termination.

208.  Defendants breached their fiduciary duty and duty of loyalty to Plaintiff by engaging in the wrongful activity described herein, including but not limited to, purchasing the domain used by Plaintiff in their own name (and transferring ownership of Plaintiff's existing domain) and then holding these Domain Names hostage upon Plaintiff's termination of the relationship, and refusing to transfer the administrative accesses to Plaintiff's IT systems, files, folders and accounts.

209.  Defendants' actions were and are willful and malicious and without legal justification or excuse.

210.  Defendants' breach of their fiduciary duty and duty of loyalty have directly and are continuing to proximately cause substantial damage to Plaintiff's business, including loss of customer traffic, online sales and goodwill.

211.  Defendants' breach of their fiduciary duty and duty of loyalty are proximately causing Plaintiff to suffer great and irreparable damage and injury, and it will be impossible to ascertain with any degree of certainty the exact amount in money damages being caused to Plaintiff.  Plaintiff will continue to suffer by the continued acts of Defendants.

212.  By reason of the foregoing, Plaintiff is entitled to a judgment against Defendants in the full amount of its damages in an amount to be determined at trial in addition to injunctive relief.

**COUNT XI**
**(In the alternative, Prima Facie Tort – As Against Eros and WD23)**

213.  Plaintiff repeats the allegations set forth in the above paragraphs as if set forth herein.

214. Defendants, working in tandem and aiding and abetting one another, intentionally inflicted harm upon Plaintiff in retaliation for Plaintiff having terminated its contract for services with them.

215. Plaintiff relied upon its IT systems, files, folders and accounts and its websites for e-commerce sales integral to the business's successful operation.

216. Defendants knew the importance and value of these websites to the Plaintiff's business and the need for Plaintiff to have continued administrative access to its websites, IT systems, files, folders and accounts.

28

217. Nonetheless, upon notice that Plaintiff was terminating its contract with them, Defendants withdrew Plaintiff's access to the Domain Names and business IT systems and held them hostage in exchange for an extraordinary payment, tagged at fifty million dollars ($50,000,000).

218. Defendants were, and could only have been, motivated by malicious intent and/or disinterested malevolence in retaliation for Plaintiff having terminated its contract with them.

219. Such intentional actions inflicted harm upon the Plaintiff, whose business suffered, among other things, loss of customer traffic, online sales and goodwill.

220. There was no legitimate excuse or justification for Defendants to have behaved in this manner.

221. Defendants' efforts to damage Plaintiff's business in such a manner evinces a high degree of moral turpitude that demonstrates such wanton dishonesty as to imply a criminal indifference to civil obligations.

222. As a proximate result of Defendants' prima facie tort, Plaintiff is entitled to an award of damages representing, among other things, lost profits and goodwill in an amount to be determined at trial, consequential and punitive damages in the amount no less than one million dollars ($1,000,000) or such other amount as this Court may deem just appropriate.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests judgment against the Defendants as follows:

a) On the first Count, for a judgment declaring Defendants Eros and WD23 to be in breach of the Parties' contract and awarding Plaintiff damages proximately resulting from the breach in an amount to be determined at trial;

29

b) On the second Count, for a judgment declaring Defendants Eros and WD23 to have breached their implied covenant of good faith and fair dealing and awarding damages in an amount to be determined at trial plus interest, attorneys' fees and costs, injunctive relief and such other damages as may be available at law and equity,

c) On the third Count, in the alternative, for a judgment declaring Defendants to be in violation of New York General Business Law § 349 and awarding Plaintiff actual damages in an amount to be determined at trial and attorneys fees;

d) On the fourth Count, for a judgement declaring Defendants to be in violation of the Anticybersquatting Consumer Protection Act and ordering: (a) the transfer of the domain name to Defendant as the owner of the mark; (b) an award of damages sustained, including but not limited to, the loss of profits in an amount to be determined at trial, and the costs of this Action.

e) On the fifth Count, for a judgment declaring Defendants to be in violation of the Lanham Act for trademark infringement and ordering: (a) a permanent injunction pursuant to 15 U.S.C. § 1116 enjoining Defendants, and all persons acting in concert or participation with Defendants, from using the Trademark or any confusingly similar mark in connection with any goods or services; (b) requiring Defendants to account for and disgorge all profits derived from its infringing activities pursuant to 15 U.S.C. § 1117(a); (c) an award of actual damages sustained by Plaintiff as a result of Defendants' infringement and  treble damages and/or enhanced profits based on Defendants' willful infringement; (e) reasonable attorneys' fees and costs, this being an exceptional case; (f)  interest; and (g) such other and further relief as this Court deems just and proper;

f) On the sixth Count, in the alternative, for a judgment ordering the return of the property alleged to have been converted, including the Domain Names and all administrative accesses

30

necessary to assume operational control of Plaintiff's IT systems, and an award of lost profits in an amount to be determined at trial in addition to injunctive relief;

g) On the seventh Count, in the alternative, for a judgment awarding Plaintiff economic damages in an amount to be determined at trial, reasonable attorneys' fees and costs, punitive damages in an amount no less than one million dollars ($1,000,000) or such other amount as this Court may deem appropriate, injunctive relief and such other damages as may be available at law and equity;

h) On the eighth Count, in the alternative, for a judgment declaring Defendants to have been unjustly enriched and awarding Plaintiff compensatory damages in an amount to be determined at trial, attorneys fees and costs, and such further restitution, compensation and punitive damages in an amount no less than one million dollars ($1,000,000) or such other amount as this Court may deem appropriate.

i) On the ninth Count, in the alternative, for a judgment awarding Plaintiff damages for fraudulent misrepresentation, including among other things, lost profits and goodwill in an amount to be determined at trial, reasonable attorney fees and such other compensatory and punitive damages in an amount no less than one million dollars ($1,000,000) or such other amount as this Court may deem appropriate.

j) On the tenth Count, for a judgment declaring Defendants Eros and WD23 to have breached their fiduciary duty and awarding Plaintiff the full amount of its damages in an amount to be determined at trial, in addition to injunctive relief and such other relief as this Court may deem appropriate.

k) On the eleventh Count, in the alternative, for a judgment declaring Defendants Eros and WD23 to have committed a prima facie tort and awarding Plaintiff the full amount of its

31

damages, representing loss profits and goodwill, in an amount to be determined at trial, consequential and punitive damages in an amount no less than one million dollars ($1,000,000) or such other amount as this Court may deem appropriate.

l) For a judgment awarding Plaintiff attorneys' fees and costs; and

m) Granting Plaintiff such other and further relief as this Court may deem appropriate.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues triable.

Dated:      New York, New York
            April 28, 2026                          Weinberg Zareh Malkin Price LLP

                                                     __/s/ _Omid Zareh
                                                    By:    Omid Zareh, Esq

                                                    45 Rockefeller Plaza, 20th Floor
                                                    New York, NY 10111
                                                    ozareh@wzmplaw.com
                                                    (212) 899-5472
                                                    *Attorneys for Plaintiff*